I do wish to reserve two minutes for rebuttal, if I may. Yes, keep your eye on the clock and we'll try to help. All right, thank you. The main issue that I'd like to speak about this morning is the one relating to the voluntariness of the un-Mirandized statements. I can certainly speak to the other issue as well if the court has questions. But on the Miranda issue or on the voluntariness issue, there really is no dispute in this case that the defendant was not given adequate Miranda warnings. The district court so found and suppressed evidence of the statements in the government's case in chief. We maintain in this appeal that the court should have taken the additional step of suppressing those statements for impeachment purposes as well by finding that the statements were involuntary. The test for voluntariness is examined under the totality of the circumstances, which requires the court to look at a number of circumstances and factors surrounding the interrogation. The main ones that we're looking at that we're asking the court to consider are the physical attributes of the place where this interrogation happened. Essentially a jail setting, but even more than a jail setting in the sense that it was beyond several levels of security, secured doors, secured elevator where this interview happened. And the other main point is this critical statement that was made very near the outset of the interrogation where the agent said to the defendant, she used the word technically, but she also said technically we cannot leave until we get this sorted out. We're in an airport. Technically, we cannot leave this place, which, as I mentioned, was a very secure place until we get this matter sorted out. And then what followed was sort of a half hearted attempt at a Miranda warning, which the district court found to be inadequate and purposefully inadequate. I ask you, it seems like the most incriminating thing that happened during this interrogation was your client's suggestion that Paula was real or treating Paula as real. And it seems to me that that had already happened before he entered the interrogation room, because the whole reason he was willing to go with them was to help them find Paula. So I don't really know what harm came from the interrogation beyond the harm that had already occurred. Well, Paula was presented to him as a real person the moment that they contacted him. So so, yes, that's true. He did say that. But as he later explained during the course of that interview is that that he didn't think that she was real all along, or at least during this whole period that preceded all this when he was having conversations with. But isn't the problem I mean, I think your argument is that the statement that happened during the interrogation led him to not want to testify because he would have been impeached with it. And that statement would be that Paula was real and that had already happened. Or am I misunderstanding what what the concern is? Well, I think the concern would have been not only that that already happened, but then then there was the inconsistency because then he changed the story during the course of the interrogation. But I mean, his story at trial would have been Paula isn't real. And this was all a fantasy. But that was already impeached by what had happened before the interrogation. Sure. But that was that was one example, Your Honor, of, you know, an inconsistency. You know, I think that he probably said many other things in terms of his answer to specific questions about, you know, why he brought a teddy bear along with him and the underpants and other questions. So I think really, if he had taken the stand, and unfortunately, we don't have a record of what actually he would have testified to. I realize the government has pointed to that as a problem for us. We don't have a record of what he actually would have testified to had he taken the stand. But we do have some indication in the record that he would have wanted to take the stand. Let me ask you on that precise point. Assume for the moment that I agree with you that this was not voluntary. How much of a showing do you need to make that this is what kept him off the stand? And related to that, how much of a showing do you need to make that if he had taken the stand, he would have said something that would have been helpful to him? Your Honor, that's really an unresolved question. I think both of us pointed to this district court case on the other side of the country that dealt with this and essentially decided that the showing, as far as, you know, harmless air analysis or whether we're talking about preservation of air, doesn't and shouldn't have to be all that significant. Because the defendant shouldn't have to, if he's not going to take the stand, he shouldn't have to reveal to the government at the district court level what he would have testified to. There should be some indication, I would agree, that of an intent to want to take the stand were it not for this ruling. And I think we do have that in this record where the judge specifically asked the defense counsel if the defense wanted to have a ruling on the voluntariness issue. And the defense attorney responded, yes, please, because we want to advise our client accordingly. And that's that ER 839. And then at the end of the judge's oral ruling, he stated at the very tail end of that, that he was making the ruling regarding voluntariness specifically for that purpose and the defendant can make a decision. And so I don't think that the showing should really have to be much, much more than that, Your Honor, because again, then that would require the defendant essentially to state on the record what he would have testified to before the trial began. And the government could then use that to its advantage through the course of the trial to have a better understanding of what his defense was. Are you basically asking us to treat this as structural error, that this is a denial of the right to testify that would be structural error in your view? Well, it's certainly akin to structural error in the sense that I don't believe we have to make a showing of harmless error. So I think that there should be some indication of what the defendant did that just had some bearing on the defendant's decision to testify. And I think we do have that. And you think that if you can show that, then that's it, you have a structural error because then he didn't, just the discouraging him to testify through this evidentiary ruling was structural error at that point in your view? Yes, Your Honor, because of the importance that's laid upon this decision to whether a defendant testifies or not. It's a fundamental right under the Fifth Amendment to decide whether to testify or not to testify. So in that sense, it is akin to a structural error. Mr. Olson, may I ask you, the district court judge found voluntariness in the statements, in the conversation that your client had with the agents. You challenged that, you say that it wasn't voluntary. What's the standard of review? What's the scope of review for us in determining whether the district court judge was correct and his finding as to voluntariness? Your Honor, I believe that, and I'll just refer to my brief here because I'm sure I cited the standard of review. But my understanding is that issues of voluntariness are reviewed as legal error. Now, there might be some factual findings that are involved in that, so it may be more of a mixed question of fact and law. But because there's so many legal issues that come into how would a reasonable person respond in this environment, this situation, I believe it's more legal error. But I'll double-check that in my brief, and perhaps I can come back to that. At this point, why don't we hear from the government, and you've sought to preserve some time. Ms. Miles. Thank you, Your Honor. Good morning. May it please the Court, Suzanne Miles for the United States. Judge Bea, I'll start with your question, the standard of review, because I think it's critical here. So ultimately, the legal question of voluntariness is a legal question that's reviewed de novo. But the factual underpinnings are reviewed for clear error. And in this case, in voluntariness, it's an incredibly fact-driven inquiry. And the district court's factual findings are detailed, they're well-researched, and they really drive the legal conclusion of voluntariness here. I don't think the factual stuff is really in serious dispute. I think the question is, what do we make of the factual stuff? I think one of the key factual things is somewhat in dispute, because the question here is not only what did the officers do, what did the agents do, but also in the voluntariness inquiry, we looked just as hard at what the defendants' reactions were. And that is where I think the factual issues are really critical. And what's lucky for us is that we have the entire interview recorded. We have the audio, we have the video, and the district court poured over that evidence. It said at one point during the suppression hearing that it watched the video eight times over. And we have all watched the video as well. It's scratchy in the beginning, but it gets quite clear in the end. And the factual findings that the district court made about the defendant's reaction is what really separates this case from all of the other coercion cases that the defendant cites in support of his argument. What the district court found with regard to the agent's conduct, now, yes, this was in custody. And, yes, it was un-Mirandaized. And the government doesn't dispute that the district court sanctioned the government with the appropriate sanction for a Miranda violation, which is suppression in the case in chief. But the court went on and then looked at whether or not this confession was coerced. And so it looked beyond just the Miranda warnings to the agent's other conduct and found that the agents made no threats, applied no pressure, no extraordinary pressure beyond the custodial setting. There was no use of force, physical or psychological. And, like I said, the district court also focused on what the defendant's reactions were in this case. And we can see from the video that this entire interview had a tone of being calm and conversational, both on the part of the agents, but also on the part of the defendant. And here is one of the critical pieces. The district court found that there was no indication that this defendant, Mr. Hopkins, was actually intimidated by this interview, that he showed a willingness and a desire to talk throughout. And that is really one of the critical pieces, as I said, that separates that this case from this court's other cases where coercion has been found. Back to the standard review, though, you're saying that based upon the video, we're supposed to refer to the district judge's finding of voluntariness. Well, but he's not saying that the video is true or not true. We all know it's true. And we can look at the video as well as he can. So why is that a disputed question of fact? The disputed question is whether or not under these circumstances, including what we can observe just as well as the district judge can observe, whether this amounts to voluntariness. That's right. I don't see any factual question that the district judge resolved in terms of, you know, who was there, who said what, what was the tone of voice? No, he saw it in just exactly the same way we're going to see it. And that's exactly what we can see is that all those factual findings are true, that this was common conversational. The defendant showed no indication of being intimidated. But I'm on the question of whether or not we need to defer, not what we're supposed to draw from that. That's a different question. And you may win on that. But I'm on the question of what amount of deference we owe. I understand, Your Honor. And as I said, those factual findings are reviewed for clear error. But you're right. It comes down to the question of what do we do with those facts and how do we make a legal conclusion from them. And for that, that is a de novo review. The question of making the leap from the facts to the answer of whether or not this was voluntary or coerced is a legal conclusion that this court reviews de novo. And what you have to age you in that is the litany of other cases that show what coercion does look like, what facts lead to a legal conclusion of coercion. The defense provided all of these cases. And what we see in those cases in Cooper and in Henry, what we see are an interrogation where the defendants were brought to the point of tears, where they were interrogated repeatedly, aggressively, pressured to the point where they lost composure. We don't see that in this video. We see it in Mendiola, which the defense also cited to. And in there, the court found that the defendant was actually traumatized by the interview, that the Miranda warnings were jumbled to the point where the agents affirmatively took advantage of an underage and intellectually disabled defendant to the point that they pushed him into trauma. We don't see that here.  That one is probably the most striking, where the defendant was held in custody and interrogated over a course of about 12 hours. And what the court found there is that the defendant was virtually non-responsive, non-alert, answered one question out of maybe 30 over the course of eight minutes, I think, at some point. Again, this is what we look at when we have to make the leap from the factual findings to the legal conclusion. I think the district court did it appropriately. It laid the right record about what it saw in that video. We absolutely can watch that video for itself and see those facts borne out. And the legal conclusion follows from there. Now, unless the court has any other questions, I think we've covered most everything else in our brief. Maybe I could just ask you, if we disagreed with you about this, would it be structural error? There's no authority that I have found in this circuit or anywhere else to say that this would be classified as structural error. It would be reviewed for harmless error. Now, I understand that we have our hands tied here because we don't have the facts of what the defendant would have said on the stand. But what we do have is the overwhelming weight of the trial evidence, the tomes of chats that were put in in front of the jury. We have the value that we can see, the potential impeachment value that we can see out of this interview, which, as Your Honor noted, one of the key pieces of impeachment value coming out of this interview, and this is all that the defense has really pointed to, is the acknowledgment that Paula was real. But as Judge Friedland recognized, that was coming in because he made that admission on the concourse before he was in custody. So the value of that in terms of impeachment really goes down, at least in terms of a harmlessness analysis. So while it's true that it's harder to do a harmlessness analysis when we don't know what the defendant was going to say or if he was going to say anything, I don't think that we are unable to do a harmlessness analysis. And certainly Arizona versus Fulminante and the weight of this court's precedent in other areas, for example, in the 609 area, where we evaluate keeping out impeachment evidence and in light of a defendant not testifying, I understand that that's not a constitutional area, but we still have that same issue that's reviewed for harmlessness as well. So it's not impossible. I think in the United States versus Gillenwater, we said that we were keeping – it was an open question whether a denial of the right to testify was structural error. I think that's right, and I haven't seen a court resolve it. Certainly not one resolve it in that way. This is not the way the question is presented here, so obviously there's going to be some difference. But let me ask you a hypothetical. Let's say that Mr. Hopkins had indicated that he wished to testify and that for some reason the district judge took it in his head to say, no, you can't testify. I think it's a terrible idea. You don't want to do it. I won't let you testify. Mr. Hopkins says, I do want to testify, and the judge says, no, you can't. Now, that's obviously constitutional error. He's entitled to testify. Is that structural? I don't know the answer to that, Your Honor. I wish I did. I should go back. That one strikes me as such an obvious and clean error that it ought to be structural. It's not our case. This one here is presented in a much more subtle way. But I'm having trouble with the notion that preventing someone from testifying when we don't know what he was going to say isn't structural error because harmless error is really hard to get at in this circumstance. And when we look at the realm of structural error, I agree that some of the trial errors that are deemed trial errors and reviewed for harmlessness raise some of the same concerns for me. It's not always clear whether something is going to be structural or trial, and really the test for whether something is a trial error is whether we can weigh the evidence and see whether it ultimately was harmless. Structural errors are much less able to be put to that kind of test. But I'd be happy to research that further. We might be able to get harmlessness here in a different way in the sense that the link between saying this is voluntary and his testifying is less than certain, meaning it's not obvious to me on the facts of this case that even if he had been insulated from cross-examination based upon the interview, that he would have taken it because I think there would have been a fair amount of risk in his taking the stand anyway. I understand what the defense lawyer did. I understand what the defense lawyer said. And I understand the defense lawyer wanted to understand what the options were. And once the judge ruled that it was voluntary, he said, okay, well, that's off the table. But I'm not at all sure that if the judge had said, you know, it's involuntary and therefore it can't come in, on the way this case looked, I'm not sure had I been representing him, I would have put him on the stand. No, I don't think so. I'm sorry, Your Honor. I didn't mean to interrupt. His story about it being a fantasy was introduced by his expert witness. Yes, his defense was fully put forward by his expert witness, and you're right. I mean, the impeachment value of the chats and the fact of him having to take the stand and directly face the volumes and volumes of sexually explicit statements that he made in those chats, that tactically alone makes it seem so much more overwhelming than, you know, his statements here that indicate that maybe he might have thought that Paula was real because he didn't correct the agents at the get-go. So I agree with you, Your Honor, and I don't mean to—I'm going over time, and I'm sorry about that. But that situation that you posit, where a judge really pressures a defendant to give up a constitutional right, is very different in my mind than what we are looking at here, where we're talking about a real tactical decision. And I just don't know that we can apply the test for one to the situation that we are looking at here. Okay. Okay. Any further questions for the government from the bench? Okay, thank you. Mr. Olson, why don't we put two minutes on the clock? Thank you. Thank you, Your Honor. Okay, so there's a couple issues here, and I could come back to that question of structural error. I did want to really emphasize the point here that the test is not— And that was a holding from Hutto v. Ross Supreme Court decision all the way back to 1976. It doesn't have to be explicit threats of violence or trauma. These—coercion could occur by direct or indirect promises, however slight, or by the exertion of any improper influence. What we have in this case is that at the two-minute mark, roughly, into that interview, the agent was telling the defendant, effectively, I'm paraphrasing, you can't leave until we sort this out. So then—and then everything else that happened thereafter, for some period anyway, it certainly was calm, and he was cooperative. It got a little more confrontational as time went on. But that was—that really kind of marked the beginning of the interrogation. This statement that you're not going anywhere until we get this sorted out. But going out didn't necessarily mean that he had to talk, because he got a sort of an incomplete Miranda warning, which told him he could be silent. He could say, we'll sort it out, but I'm not saying anything more. I want to see an attorney. Yeah. You know, when you say to somebody, you're not going anywhere until we sort this out, and then you give them sort of this half-hearted Miranda warning, the first thing you said, you're not going anywhere until we get this sorted out, really sets the stage and sets the context for what was said thereafter. Your Honor, I do also want to point out that there's no official transcript of this interview, and so both parties have sort of quoted parts from the interview. I would ask the court—it sounds like the court is interested in going back and actually listening to the audio. He does not say, I'm well aware of my rights, as the government quotes in its brief. At least I cannot hear that on my audio. So he seems to be nodding in assent as she's saying to him, you don't have to talk to us. But it's not as definitive where he's saying he's well aware of his rights. So, again, that statement, that moment in time really sets the stage for the remainder of the conversation. You're right. Any further questions on the bench? Okay. Thank both sides for an interesting argument. United States v. Hopkins now submitted for decision. Thank you.
judges: W. Fletcher, Bea, Friedland